UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Mike Duggan, Mayor of the City
of Detroit, Carrol Lockett, Haley Roell,          Case No:
Joseph Vaughn, Gladys Noble, Stephanie
Huby, Ian Davis, Jacintha Pittman                  Hon.:
and Clayton Wortmann,

     Plaintiffs,

v.

Patrick McPharlin, in his official
capacity as Director of the Michigan Department
of Insurance and Financial Services,

     Defendant.

_____/

| **FINK + ASSOCIATES LAW** | **CITY OF DETROIT,** |
|---|---|
| David H. Fink (P28235) | **LAW DEPARTMENT** |
| Darryl Bressack (P67820) | Lawrence Garcia (P54890) |
| John L. Mack (P80710) | Charles N. Raimi (P29746) |
| Attorneys for Plaintiffs | Co-Counsel for Mayor Duggan |
| 38500 Woodward Ave., Ste. 350 | 2 Woodward Ave., Ste 500 |
| Bloomfield Hills, MI 48304 | Detroit, MI 48226 |
| Tel: (248) 971-2500 | Tel: (313) 237-5037 |
| dfink@finkandassociateslaw.com | garcial@detroitmi.gov |
| dbressack@finkandassociateslaw.com | raimic@detroitmi.gov |
| jmack@finkandassociateslaw.com | |

_____/

**"Michigan motorists are constitutionally entitled to have no-fault insurance made available on a fair and equitable basis .... [D]ue process, at a minimum, requires that rates are not, in fact, excessive, inadequate or unfairly discriminatory...."**

**Michigan Supreme Court, *Shavers v. Kelley*, 402 Mich. 554, 600-01 (1978).**

## COMPLAINT

NOW COME Plaintiffs, by and through their attorneys, Fink + Associates Law as counsel for all Plaintiffs and the City of Detroit Law Department as co-counsel for Mayor Mike Duggan, and for their Complaint, state as follows:

## INTRODUCTION

1.     Michigan's mandatory No-Fault automobile insurance system violates the constitutional rights of Michigan's citizens. Once the State issues a driver's license, it cannot deprive a citizen of the primary benefit of the license – the ability to drive a motor vehicle – without first providing constitutional due process. Unfortunately, countless Michigan residents are deprived of that due process because No-Fault insurance is not available at fair and equitable rates.

2.     Michigan's average annual auto insurance premium of $3,059 is more than double the average annual premium in neighboring states: Ohio ($1,236); Illinois ($1,158); and, Indiana ($1,365). The national average cost for auto insurance is $1,512.

3.     The high cost of auto insurance in Michigan puts significant economic pressure on an already financially-strapped population. A 2016 United Way Report found that, while 15% of Michigan households live below the Federal Poverty Level, an additional 25% live above the poverty level but still struggle to afford basic household needs such as housing, childcare, food and transportation.

4.      With so many of the State's residents struggling financially, and the cost of insurance premiums so high, it is no wonder that Michigan has one of the highest rates of uninsured motorists in the country, with more than 20% of drivers lacking coverage.

5.      The extremely high cost of No-Fault insurance coverage in Michigan is a statewide issue that is particularly acute in the Detroit Metropolitan area. Over 50% of Detroit workers commute to jobs that are outside the City limits, and almost 75% of the jobs within the City are held by workers who commute in from the suburbs.

6.      Detroit drivers pay an average of $6,197 annually for auto insurance coverage, a figure that is 4 times the national average. In fact, Detroit has the highest auto insurance rates of any city in the nation.

7.      Residents of many other Metro Detroit communities also pay exorbitant auto insurance premiums. In Dearborn, the average annual premium is $5,135; in Southfield, the average premium is $4,443; the average premium in Warren is $3,446; and Roseville residents pay an average of $3,378 for auto insurance. Residents in each of these communities pay, on average, 2 or 3 times the national average for insurance coverage.

8.      By contrast, the average premium in Cleveland, Ohio is $1,674; in Chicago, Illinois, the average premium is $1,765; and, in Indianapolis, Indiana, the average driver pays $1,538.

9.     Excessive insurance premiums have a catastrophic impact for many Detroit residents. The average household income in Detroit is just over $26,000, which is less than half the national average of $55,322. Almost 40% of the City's residents are living in poverty.

10.   Financial experts recommend allocating roughly 15% of a household budget to transportation expenses. These expenses include the costs of purchasing, financing or leasing a vehicle, costs of gas and motor oil, costs for repairs and other vehicle expenses, and costs for alternate transportation. Between 2013 and 2016, the average U.S. consumer spent $3,550 on vehicle purchase costs and $2,200 on gas and motor oil expenses each year. Adding these average expenses to the average Detroit auto insurance premium would result in $11,947 in transportation costs. For a driver with a household income equal to the Detroit average ($26,249), these expenses for one driver would consume over 45% of total household income, before factoring in any public transportation costs or other vehicle related expenses.

11.   The natural consequence of the high cost of No-Fault insurance is that Detroit area drivers are faced with a no-win situation. Many drivers who must rely on personal automobiles for transportation are forced to make difficult cuts to other household expenses, such as housing, food, or healthcare in order to afford their auto insurance. Some vehicle owners are forced to give up driving because they

cannot legally register their vehicles, while others are forced to break the law and drive without insurance.

12.    According to reports, nearly half of Detroit's drivers are uninsured. In 2017, the Detroit Police Department issued 23,087 citations to motorists for driving without insurance.

13.    The U.S. Department of Housing and Urban Development considers any family spending more than 30% of its annual income on housing to be "cost burdened." Many Michigan families are "cost burdened," not because of unaffordable housing, but because of unfair auto insurance premiums.

14.    No-Fault insurance has not achieved the state-wide cost savings initially promised in the 1970s. Instead, the volume of auto accident related litigation, which was expected to decrease under No-Fault, is out of control, bogging down Michigan's courts more than ever. Insurance rates, which were supposed to decrease, have grown dramatically. Michigan is the state with the most expensive auto insurance in the United States, and no city in the United States has auto insurance rates as high as the rates in Detroit.

15.    Michigan's     mandatory     No-Fault     insurance     has     become unconstitutionally unaffordable for several reasons, including:

   a. Michigan No-Fault coverage must include **unlimited** statutory personal injury protection ("PIP") benefits, when the state with the second highest

5

mandatory coverage, New York, caps non-emergency medical coverage at $50,000;

b. There is no fee schedule for auto accident-related medical services, such as the fee schedule for medical services reimbursed under Workers' Compensation;

c. Medical providers are allowed to charge exorbitant fees for medical procedures and services normally priced at a fraction of No-Fault rates;

d. Insurance companies are not permitted to create closed medical benefit networks with physicians who would agree to reduced fees for various medical services;

e. There are no effective protections against those auto accident attorneys who encourage over-treatment and who pursue large PIP recoveries for minor injuries;

f. There are no meaningful limitations on attendant care coverage, with non-professional providers allowed to charge high hourly rates and to provide unnecessary "services" 24 hours a day;

g. There are few protections against health care, attendant care and transportation providers who provide unnecessary and over-priced services.

16.    The No-Fault Act has failed Michigan residents at every turn. This lawsuit seeks a declaration that the law is unconstitutional. The State should be given 6 months to repair the automobile insurance scheme. If that deadline is not met, the No-Fault Act should be deemed null and void and the tort system should be reinstated.

## NATURE OF THE ACTION

17.    This is an action seeking a declaration that the Michigan No-Fault Insurance Act (the "No-Fault Act"), M.C.L. § 500.3101 *et seq.,* is unconstitutional in its current form and in its application under the U.S. and Michigan Constitutions.

18.    Michigan, like most states, requires vehicle owners to obtain insurance prior to registering or operating their vehicles. Driving without insurance is a misdemeanor with penalties of up to 1-year imprisonment.

19.    With mandatory no-fault insurance, people who are injured recover their losses from their own insurance company.

20.    In the 1970s, when many states experimented with the no-fault concept, proponents believed it would reduce automobile insurance costs. Unfortunately, those states soon discovered that the promised cost savings did not materialize. Instead, premiums increased. That has been Michigan's experience.

21.    After Michigan adopted the No-Fault Act in 1972, the Michigan Supreme Court ruled that because the State chose to make no-fault insurance

compulsory for all motorists, the State must ensure that coverage is available at fair and equitable rates.

22.     If insurance rates become excessive, unfair or inequitable, the No-Fault law becomes unconstitutional.

23.     It is indisputable that Michigan's insurance rates have become unconstitutionally excessive, unfair, and inequitable. Michigan residents universally pay more for auto insurance than do residents of any other state.

24.     The problem is worse in the City of Detroit and other urban areas. Detroit residents pay, on average, $6,197 annually, including collision and comprehensive coverage.

25.     A significant number of Michigan car owners cannot afford to purchase auto insurance, preventing them from pursuing employment and educational opportunities, traveling freely, shopping for groceries, taking their children to school or child care, visiting friends and family, patronizing local businesses, or otherwise attending to the numerous things made possible by driving a motor vehicle.

## **PARTIES**

26.     Plaintiff Mike Duggan is a resident of the City of Detroit, County of Wayne, and a citizen of the State of Michigan. He is also the elected Mayor of the City of Detroit. Mayor Duggan joins the other Plaintiffs in this lawsuit to protect the rights of all Detroit residents who are being charged excessive, unfair and

inequitable premiums, and to obtain a declaration that the No-Fault Act is unconstitutional.

27.    Plaintiff Carrol Lockett is a resident of the City of Oak Park, County of Oakland, and a citizen of the State of Michigan. Ms. Lockett, age 69, volunteers at her local church and at a large community activities center, where she operates the neighborhood hotline. Ms. Lockett pays an insurance premium of $329 per month, including collision and comprehensive coverage. She has not been involved in an auto accident in over 20 years, has a clean driving record and only drives 10-15 miles daily, yet her auto insurance payment is almost as much as her car payment, comprising nearly 15% of her monthly income. Ms. Lockett has periodically had to give up driving because she could not afford insurance.

28.    Plaintiff Haley Roell is a resident of the City of Ann Arbor, County of Washtenaw, and a citizen of the State of Michigan. Ms. Roell, age 20, is a senior at the University of Michigan, where she also works as a student research assistant. Recently, Ms. Roell, who has never received a ticket or been in an auto accident, was required to pay more than $400 per month for car insurance. She was unable to meet her monthly payments and was forced to periodically forgo driving when her insurance coverage lapsed. As of the date of this Complaint, Ms. Roell's temporary research assistant position allows her to obtain low-cost insurance. Thus, she is

currently able to use her car, but, when her short-term employment ends, she will, once again, face unaffordable insurance rates.

29. Plaintiff Joseph Vaughn is a resident of the City of Detroit, County of Wayne, and a citizen of the State of Michigan. Mr. Vaughn, age 53, owns several businesses and is heavily involved in community service, including serving as a Detroit Police Department reservist, volunteering as a mentor in the Man to Man mentorship program, and coordinating a mentorship program through Detroit Mumford High School. Mr. Vaughn is currently uninsured because he cannot afford the cost of No-Fault insurance. He was recently quoted a price of $4,000 for six months of insurance coverage, a total that equates to 15% of his income, even though he has never had a ticket or been in an auto accident.

30. Plaintiff Gladys "Peggy" Noble is a resident of the City of Detroit, County of Wayne, and a citizen of the State of Michigan. Ms. Noble, age 76, is a retired social worker who obtained her Master's Degree in Social Work at the age of 65. An active member of her community, Ms. Noble serves as president of her neighborhood community association and as a mentor to young mothers. She has periodically had to forego driving because she could not afford to pay for both auto insurance and basic necessities such as food and medication. Her car insurance payment is over $210 each month, for basic coverage without collision and comprehensive. This is almost 20% of her monthly income. Ms. Noble has had a

spotless driving record for 60 years, and she drives a 16-year old vehicle.

31.    Plaintiff Stephanie Huby is a resident of the City of Eastpointe, County of Macomb, and a citizen of the State of Michigan. Ms. Huby, age 49, has been employed by the same employer for more than 18 years. Ms. Huby has a perfect driving record, yet she pays $250 per month for automobile insurance. Ms. Huby's monthly insurance payment, which is more than twice the national average, is also more expensive than the monthly lease payment on her vehicle. In the past, Ms. Huby has been forced to let her insurance coverage lapse because she could not afford the monthly payments.

32.    Plaintiff Ian Davis is a resident of the City of Oak Park, County of Oakland, and a citizen of the State of Michigan. Mr. Davis, age 27, is employed by a non-profit organization focusing on low income senior housing. Mr. Davis has never been involved in an auto accident, and he has not received a traffic ticket in nearly five years. He drives a 2012 Honda Civic and pays nearly $2,400 annually for insurance coverage.

33.    Plaintiff Jacintha Pittman is a resident of the Village of New Haven, County of Macomb, and a citizen of the State of Michigan. Mrs. Pittman, age 39, is employed as an esthetician. Mrs. Pittman drives a 2008 Saturn Vue. She has never been in an auto accident and does not have a single moving violation on her traffic record. However, as of September 1, 2018, her insurance premium will be $325 per

11

month.

34.     Plaintiff Clayton "Clay" Wortmann, is a resident of the City of Detroit, County of Wayne, and a citizen of the State of Michigan. Mr. Wortmann, age 25, works as a tutor for high school students and as a respite care provider for people with special needs. He also volunteers with Auntie Na's House, a community outreach center that provides support to low-income families in Detroit. He drives a 2015 Chevrolet Cruze and has never received a traffic ticket. Mr. Wortmann's monthly insurance premium is $280, more than twice the national average.

35.     Defendant Patrick McPharlin is the Director of Michigan's Department of Insurance and Financial Services, which is charged with the regulation and enforcement of Michigan's No-Fault insurance system. He is being sued solely in his official capacity.

## JURISDICTION AND VENUE

36.     This matter arises under the constitutions and laws of the United States and the State of Michigan.

37.     Jurisdiction is proper in this Court pursuant to Article III of the United States Constitution, 28 U.S.C. § 1331, 28 U.S.C. § 2201 and 42 U.S.C. § 1983.

38.     Venue is proper in the Eastern District of Michigan, Southern Division, because Plaintiffs are residents of counties in this District and the action is being pursued against the Director of the Michigan Department of Insurance and Financial

Services.

39.     Plaintiffs seek a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.

40.     Plaintiffs do not have an adequate remedy in state court. The Michigan Court of Claims has exclusive jurisdiction over all claims brought against the State, including federal or state statutory or constitutional claims. M.C.L. § 600.6419(1). However, a claimant is not permitted to file a claim against the State in the Court of Claims (or any other Michigan state court) if, as here, the claimant has an adequate remedy in the federal courts. M.C.L. § 600.6440.

## GENERAL ALLEGATIONS

### The Enactment of the No-Fault Act
### and the Seminal Michigan Supreme Court Opinion on its Constitutionality

41.     The No-Fault Act was enacted in October of 1973. Michigan was among 19 states that adopted no-fault insurance by 1976, after which no additional state chose to do so.

42.     The preamble to the Michigan Insurance Code of 1956 states the law is intended "to provide for the continued availability and affordability of automobile insurance … in this state and to facilitate the purchase of that insurance by all residents of this state at fair and reasonable rates …."

43.     The No-Fault Act, like the no-fault laws adopted in other states, was intended to provide victims of automobile accidents with faster and more adequate

compensation than was offered under the previous common law tort system. The No-Fault Act abandoned the common law fault determination, eliminating the right to sue the responsible party in most motor vehicle accidents, but allowing accident victims to seek compensation through their own insurance companies. This was expected to decrease premium costs and lessen litigation costs statewide.

44.     The constitutionality of the No-Fault Act was addressed in 1978 by the Michigan Supreme Court in *Shavers v. Kelley*, 402 Mich. 554 (1978) ("*Shavers*"). The *Shavers* decision set forth the test for determining the constitutionality of the No-Fault Act.

45.     First, the Supreme Court upheld the concept of no-fault insurance, because insurance protects "not only the driver of a motor vehicle, but also passengers, pedestrians, owners of fixed property, and owners of properly parked vehicles." *Shavers* at 596. Thus, "those who use the public highways may properly be required to provide security for loss that may predictably be suffered by others on account of such use …." *Shavers* at 596-97.

46.     The Court then analyzed whether the law contained adequate constitutional protections. The Court stated, "the concepts of liberty and property protected by due process are not to be defined in a narrow or technical sense but are to be given broad application." *Shavers* at 598 (citations and internal punctuation omitted). "The existence of interests or benefits entitled to due process protection

14

depends on the extent to which government activity has fostered citizen dependency and reliance on the activity." *Shavers* at 598. "It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined." *Shavers* at 598 (citing, among other things, the U.S. Supreme Court case of *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)).

47.    In *Shavers*, the Michigan Supreme Court recognized the critical importance of the automobile to transportation in the State. "In Michigan the independent mobility provided by an automobile is a crucial, practical necessity; it is undeniable that whether or not a person can obtain a driver's license or register and operate his motor vehicle profoundly affects important aspects of his day-to-day life." *Shavers* at 598.

48.    Of paramount importance, a "driver's license, once issued, is a significant interest subject to constitutional due process protections." *Shavers* at 599 (citation omitted). The Court stated:

> Although the compulsory insurance requirement of the No-Fault Act does not directly affect the issuance of a driver's license, it directly affects the use of such a license: a licensee may not register or operate a motor vehicle in Michigan without no-fault insurance. A driver's license is, clearly, of little use unless a licensee can register and operate a motor vehicle. We believe that the interest in registering and operating a motor vehicle is as significant as the interest in the use of a driver's license.
>
> In choosing to make no-fault insurance compulsory for all motorists,

> the Legislature has made the registration and operation of a motor
> vehicle inexorably dependent on whether no-fault insurance is available
> at fair and equitable rates. Consequently due process protections under
> the Michigan and United States Constitutions (Const.1963, art. 1, s 17;
> U.S. Const. Am. XIV) are operative.

*Shavers* at 599.

49.     Furthermore, the Supreme Court held that the No-Fault Act "fostered

the expectation that no-fault insurance will be available at fair and equitable rates,"

because the Act "states that Rates shall not be excessive, inadequate or unfairly

discriminatory" and because it "provides the guarantee that no-fault insurance

coverage will be available to any person who is unable to procure such insurance

through ordinary methods." *Shavers* at 599. (citations to statutes omitted).

50.     The Court then stated "[w]e therefore conclude that Michigan motorists

are constitutionally entitled to have no-fault insurance made available on a fair and

equitable basis." *Shavers* at 600.

51.     Having found that the "availability of no-fault insurance and the no-

fault insurance rate regulatory scheme" are "subject to due process scrutiny," the

Supreme Court then examined the law to determine whether it satisfied that scrutiny

by ensuring that Michigan motorists would have no-fault insurance available to them

on a fair and equitable basis. *Shavers* at 600.

52.     The Court gave clear guidance regarding the minimum requirements of

due process: "due process, at a minimum, requires that rates are not, in fact,

excessive, inadequate or unfairly discriminatory …" *Shavers* at 601 (citations omitted).

53.     The Supreme Court held that the law did not provide adequate mechanisms to ensure that no-fault insurance would be available on a fair and equitable basis. *Shavers* at 580. Simply put, the law was "inadequate to protect individual motorists, who must purchase no-fault insurance from private insurers, from potentially unfair insurance rates, insurance refusal or cancellation." *Shavers* at 580.

54.     The Supreme Court thus came to the inevitable conclusion that while the No-Fault Act was generally constitutional, it was rendered unconstitutional by its failure to ensure that rates would be fair and equitable. The Court stated:

> [t]he constitutional status of the No-Fault Act places this Court in an extraordinary jurisprudential position: the No-Fault Act, which has substantially affected every Michigan motorist, every insurance company underwriting motor vehicle insurance in Michigan, and our entire system of civil justice for nearly five years, is constitutional in its general thrust but unconstitutionally deficient in its mechanisms for assuring that compulsory no-fault insurance is available to Michigan motorists at fair and equitable rates.

*Shavers* at 581.

55.     Despite finding the No-Fault Act unconstitutional, the Supreme Court did not strike down the law. Instead, the State Legislature and the Governor were given 18 months to correct the constitutional deficiencies.

56.     In response to the *Shavers* decision, the State Legislature passed the

Essential Insurance Act ("EIA") of 1979.

57.    The EIA contained various provisions that were supposed to address the Supreme Court's decision that the law lacked genuine mechanisms to ensure that rates would be fair and equitable.

58.    In 1982, the Michigan Supreme Court entered an order regarding the constitutionality of the No-Fault Act, subsequent to the legislative "fixes" in the EIA. The Order read, in its entirety:

> [o]n order of the Court, the opinion in *Shavers* [], subsequent legislation [the EIA], the briefs of the parties, the oral argument in this Court, and the opinion of the Wayne Circuit Court after our November 21, 1979, order of remand are considered. Because there has been no further claim that this act, as recently amended, is unconstitutional, we decline to so hold. **However, this order should not be construed as foreclosing future attacks on the constitutionality of the act based upon the concerns expressed in our opinion**.

*Shavers v. Attorney Gen of State*, 412 Mich. 1105 (1982) (citations to EIA omitted; emphasis added).

59.    Importantly, the Supreme Court never evaluated the question of whether the 1979 EIA statutory changes corrected the constitutional deficiencies of the No-Fault Act, because, at the time, there was no further challenge to the law.

60.    Instead of addressing the constitutionality of the No-Fault Act, with the statutory changes in the EIA, the Supreme Court explicitly held that it was not foreclosing future challenges to the No-Fault Act based on the deficiencies identified in the earlier Opinion.

61.    Subsequent to the Supreme Court's decision not to further review the constitutionality of the No-Fault Act, the State repealed certain EIA provisions, which had been adopted in response to the first *Shavers* decision.

## No-Fault Rates Are Unconstitutionally Excessive

62.    The no-fault experiment has failed. Currently, only 12 states continue to have no-fault laws. Most of those states have substantially modified their statutes. Even with those modifications, on average, rates are significantly higher in no-fault states. The states that completely abandoned no-fault have experienced substantial decreases in premiums.

63.    Michigan's No-Fault law has failed, by a wide margin, to achieve one of its central goals, a reduction in the volume of litigation. Auto accident related litigation in the State has skyrocketed. Prior to enactment of the No-Fault Act, automobile personal injury cases accounted for a relatively small percentage of all civil litigation in Michigan. Today, auto accident litigation accounts for over 40% of the civil litigation filed in the State. The percentage is even higher in Wayne and Macomb County.

64.    It has been reported that the average costs claimed per accident victim in Michigan is more than 5 times higher than the next highest state, even though there is no evidence that injuries incurred by Michigan accident victims are more severe than injuries incurred anywhere else.

65.     Of constitutional import, automobile insurance rates charged to or offered to the Plaintiffs and others throughout the State, are excessive, unfair and inequitable. For far too many Michigan residents, the rates are simply unaffordable.

66.     Michigan auto insurance premiums are the highest in the nation, with Michigan car owners paying well above the national average.

67.     The numbers are worse in the City of Detroit and other urban areas, where the average auto insurance premiums are far higher than the national average and significantly higher than the State average.

68.     According to the Federal Insurance Office, the average U.S. household spends approximately 2% of its annual income on personal auto insurance.

69.     A 2017 study by the Federal Insurance Office measured auto insurance affordability in zip codes where the majority of residents were "traditionally underserved communities and consumers, minorities, and low-and moderate-income persons." The study presumed that auto insurance was unaffordable in any zip code where the average insurance premium exceeded 2% of average annual income.

70.     Many Michigan motorists are forced to pay premiums that exceed 15-20% of their annual income.

71.     Using the Federal Insurance Office standard, auto insurance is unaffordable in **every** zip code located within the City of Detroit.

72.     In fact, it has been reported that all of the nation's 25 priciest auto

insurance zip codes are in the City of Detroit.

73.     The cost of insurance policies available to Michigan motorists and to the Plaintiffs in this lawsuit is excessive, unfair and inequitable.

74.     Shortly before this lawsuit was filed, rate quotes were obtained for a driver in Northwest Detroit. Coverage was for a 2010 Chevrolet Equinox driven 15,000 miles per year for work commute and pleasure, in a single-driver household, with basic coverage and **without** collision and comprehensive coverage. The quotes obtained for a one-year policy were:

| **Insurance Company A** | **Annual Premium** |
|---|---:|
| Bodily Injury Liability | $266 |
| Property Damage Liability | $28 |
| Property Protection | $74 |
| Personal Injury Protection | $3,046 |
| Uninsured Motorist | $120 |
| Fees | $226 |
| **Total** | **$3,760** |

| **Insurance Company B** | **Annual Premium** |
|---|---|
| Bodily Injury Liability | $708 |
| Property Damage Liability | $48 |
| Property Protection | $54 |
| Personal Injury Protection | $2,853 |
| Uninsured Motorist | $98 |
| Fees | $120 |
| **Total** | **$3,881** |

75.   The harm caused by unfair and inequitable insurance rates is significant. Because insurance coverage is not available at fair, equitable and affordable rates, many people are forced to break the law and risk criminal prosecution. They also face potentially crippling economic loss because in the event of an accident, they receive no insurance benefits, and they forfeit the right to sue responsible parties.

76.   The fact that so many drivers are forced to drive without insurance further exacerbates the problem, causing premiums to increase even more.

77.   It is common for many people to purchase insurance policies for approximately $250-$275 that are only effective for one week, so that they can register a vehicle or retrieve it from an impound lot. Those people then drive uninsured during most of the year. One insurance company that sells these policies currently has over 70 locations in the Detroit area.

## Reasons for Excessive Insurance Costs

78.     There are many popular myths and false assumptions regarding the reason for the high cost of insurance in Michigan.

79.     The most common misconception is that rates are higher in urban areas, or even statewide, because of auto theft. In fact, theft comprises, on average, approximately 18% of a premium with comprehensive coverage. Moreover, that amount is not included in the premium for a basic no-fault policy.

80.     Michigan Auto Theft Prevention Authority statistics show that vehicle theft in Michigan dropped 70% between 1986 and 2015. During that time, the cost of comprehensive coverage dropped, but, because of the No-Fault law, the cost of statutorily-mandated coverages went up. In fact, Michigan insurance rates **increased** dramatically as vehicle theft **decreased** dramatically.

81.     Another misconception is that premiums are higher because of higher collision rates. However, in June 2017, one national study reported that Metro Detroit drivers were the best drivers out of the nation's 75 largest metropolitan areas. The authors noted that Metro Detroit had the lowest accident rate out of all 75 areas reviewed.

82.     Experts agree that the largest contributor to the cost of Michigan's no-fault insurance is first-party personal injury protection coverage and the lawsuits related to those PIP benefits.

83.     Michigan's No-Fault law is unique. Michigan is the only state that mandates unlimited PIP medical and attendant care benefits. New York offers the second most comprehensive No-Fault medical coverage, with non-emergency medical benefits capped at $50,000.

84.     A *Detroit Free Press* investigation found that the "number of lawsuits generally filed by motorists and passengers in accidents who are seeking benefits from their own auto insurance companies … have nearly quadrupled in Wayne County since 2004, even as accidents have dropped."

85.     Michigan's No-Fault Act has created a system where certain lawyers and doctors prosper from enormous, unwarranted fees. A small number of lawyers and medical providers aggressively solicit accident victims and encourage them to seek unnecessary treatment.

86.     Some attorneys work with their clients and certain doctors or chiropractors to maximize the amount of treatment provided, seeking to make injuries appear more significant for third party claims, while increasing the potential PIP benefit recovery. Attorneys often collect as much as one-third of the No-Fault expenses.

87.     Some medical providers will "treat" people who were not injured, will over-treat others, and will provide unnecessary treatments (such as unneeded imaging scans).

88.     The high cost of PIP coverage is also caused by, and exacerbated by, the absence of substantive, statutory restrictions on the fees that medical providers can charge for treatment and services.

89.     The absence of a fee schedule, such as the fee schedule used for Workers' Compensation benefits, means that for many common procedures, medical providers charge insurance companies two to five times more than the rates charged for the same procedures to Medicare.

90.     As reported by the *Detroit Free Press* "[s]ome MRI centers that appear frequently in no-fault lawsuits in metro Detroit charge as much as $5,300 for an MRI that would cost less than $1,000 at other facilities or about $500 under Medicare." The investigation also found that people are steered to such facilities by some lawyers and medical providers.

91.     The escalating costs are severe. PIP coverage accounted for roughly 20% of the cost of automobile insurance premiums in Michigan in 2000. By 2013, those benefits accounted for approximately 50% of the cost of premiums.

92.     According to an analysis of data reported by the National Association of Insurance Commissioners, the average cost of medical treatment in Michigan under no-fault tripled from 2000 to 2013. This increase outpaced healthcare inflation by almost 90%.

93.     While medical expenses are a key cause of skyrocketing PIP costs,

other elements of No-Fault coverage also contribute.

94.     Michigan's PIP coverage includes household replacement services, attendant care, wage loss and medical transportation costs, in addition to coverage for all reasonably necessary medical expenses. Some medical doctors will routinely declare accident "victims" disabled for months after even minor accidents, which, as reported by the *Detroit Free Press*, provides "an opportunity for relatives or friends to get paid hundreds of dollars a week" for attendant care.

95.     The law limits expenses for replacement services and wage loss, but the lack of restrictions on attendant care and transportation services invites abuse, driving up the cost of No-Fault coverage.

96.     Attendant care benefits allow accident victims to have in-home assistance for services such as safety monitoring, bathing, administering medicine and other personal tasks associated with daily living. Many accident victims "hire" family members or close friends to provide these attendant care services. There is little to prevent people from charging insurance companies for care that is not actually needed or care that is not being provided. In the *Detroit Free Press* investigation, some caregivers were found to have charged insurance companies for 24-hour attendant care or charged for care provided at times where the accident victims were observed grocery shopping or driving unattended. As with other No-Fault benefits, some attorneys will take 33% of the attendant care costs, even for

26

care provided prior to a lawsuit being filed.

97.    Michigan's No-Fault Act lacks measures to protect against fraud, such as requiring that caregivers be trained, certified or qualified in any way. Additionally, the No-Fault Act sets no limit on the hourly amount that can be charged for 24-hour a day attendant care.

98.    The No-Fault Act lacks reasonable restrictions on the rates that can be charged to transport accident victims to medical appointments. As found in the *Free Press* investigation, medical transportation services "routinely charge auto insurance companies $100 to almost $200 a day to shuttle no-fault patients to and from a single medical appointment — even one just 2 miles away." Quite often, the transportation is in a standard shuttle bus or car, meaning the "patient" could just as easily have taken a taxi or a ridesharing service. One transportation company charged $100 each way to transport an individual two miles to and from medical appointments, racking up $3,500 in fees over several months.

**The No-Fault Act Deprives Motorists of Due Process**

99.    The net outcome of No-Fault has been a disaster. The No-Fault insurance scheme, in its current form, is not just ill advised, it is unconstitutional. Mandatory insurance premiums are excessive, unfair and inequitable.

100.    In order to pass constitutional muster, the No-Fault Act, or related legislation, must ensure that coverage is available at fair and equitable rates. Rates

may not be excessive and they may not be unfairly discriminatory.

101.   The State has refused to rein in No-Fault costs and to bring the No-Fault Act into compliance with the constitutional mandate that rates cannot be excessive, but must be fair and equitable.

102.   The No-Fault Act does not ensure that coverage is available at fair and equitable rates, as is evidenced by the fact that rates are excessive, unfairly discriminatory and neither fair nor equitable.

103.   The EIA states that "[r]ates shall not be excessive … or unfairly discriminatory." M.C.L. § 500.2109(1)(a). However, the statute does not adequately ensure that those statutory requirements are met. Rather, for all practical purposes, the language of the EIA essentially ensures that no rate could be deemed excessive or unfairly discriminatory, no matter how excessive or discriminatory the rate actually is.

104.   The EIA states, "a rate shall not be held to be excessive unless the rate is unreasonably high for the insurance coverage provided and a reasonable degree of competition does not exist for the insurance to which the rate is applicable." M.C.L. § 500.2109(2). This provision has as little substantial meaning as the language in the No-Fault Act rejected by the Michigan Supreme Court, because the EIA does not define what constitutes an "unreasonably high" rate. Even if a rate could otherwise be considered "unreasonably high," the rate would not be

considered excessive if there is a reasonable degree of competition. For practical purposes, this means that as long as there are several insurance companies in the market, no rate can be deemed excessive.

105.   The EIA definition of an unfairly discriminatory rate has the same deficiency. M.C.L. § 500.2109(1)(c). In order to determine whether a rate is "unfairly discriminatory," the rate must be compared to other rates, but this is a meaningless test when the rate used for comparison is itself unfairly discriminatory.

106.   Ultimately, the actual rates are the best evidence that Michigan's No-fault insurance premiums are unconstitutional. It is undeniable that actual rates in Michigan are excessive, unfair and inequitable.

## COUNT I - VIOLATION OF PROCEDURAL DUE PROCESS

107.   Plaintiffs repeat the preceding paragraphs as if fully alleged herein.

108.   Due process enforces rights enumerated in the United States and Michigan Constitutions.

109.   The United States Constitution, U.S. Const., amend. XIV, and Article I, § 17 of the Michigan Constitution of 1963 both guarantee that no state shall deprive any person of "life, liberty, or property, without due process" of law.

110.   In *Shavers*, the Michigan Supreme Court unambiguously held that Plaintiffs have a constitutionally protected property interest in the use of their drivers' licenses, including the registration and operation of motor vehicles.

111.    As long as no-fault insurance is mandatory for the registration and operation of their vehicles, Plaintiffs have a constitutional right to obtain no-fault insurance at rates that are fair, equitable and not excessive.

112.    Defendant has failed to ensure that auto insurance is available to Plaintiffs at non-excessive, fair and equitable rates. No-Fault rates, at the time of the filing of this Complaint, are excessive, unfair and inequitable.

113.    As a direct and proximate result of Defendant's conduct, Plaintiffs are being injured by the deprivation of their rights, without procedural due process.

## COUNT II - VIOLATION OF SUBSTANTIVE DUE PROCESS

114.    Plaintiffs repeat the preceding paragraphs as if fully alleged herein.

115.    The right to substantive due process is protected under the due process clauses of the U.S. and Michigan Constitutions.

116.    The *Shavers* court imposed substantive due process requirements with respect to the No-Fault Act.

117.    Insurance rates under the No-Fault Act are excessive, unfair and inequitable.

118.    Plaintiffs have been, and will continue to be, injured by Defendant's violations of Plaintiffs' rights to substantive due process.

## COUNT III – REQUEST FOR DECLARATORY RELIEF

119.    Plaintiffs repeat the preceding paragraphs as if fully alleged herein.

120.   There is a real and actual controversy between Plaintiffs and Defendant regarding the constitutionality of the No-Fault Act and regarding Defendant's acts and practices.

121.   Plaintiffs are entitled to a declaratory judgment holding that the No-Fault Act, as currently enacted and implemented, unconstitutionally deprives Plaintiffs of their rights without due process.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

1.   Declare that the No-Fault Act is unconstitutional under the U.S. and Michigan Constitutions.

2.   Grant the State 6 months to amend the No-Fault Act to cure all constitutional defects and to ensure that Michigan's automobile insurance scheme comports with the requirements of the U.S. and Michigan Constitutions.

3.   Order a return to the pre-existing common law tort system, if the State is unable to cure all constitutional defects of the No-Fault Act within 6 months.

Respectfully submitted,

**FINK + ASSOCIATES LAW**

Dated: 8/23/2018

By:    /s/ David H. Fink
David H. Fink (P28235)
Darryl Bressack (P67820)
John L. Mack (P80710)
Attorneys for Plaintiffs
38500 Woodward Ave., Ste. 350

Bloomfield Hills, MI 48304
Tel: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com
jmack@finkandassociateslaw.com

**CITY OF DETROIT,**
**LAW DEPARTMENT**
Lawrence Garcia (P54890)
Charles N. Raimi (P29746)
Co-Counsel for Mayor Duggan
2 Woodward Ave., Ste. 500
Detroit, MI 48226
Tel: (313) 237-5037
garcial@detroitmi.gov
raimic@detroitmi.gov